## WILLIAM WICKERSHAM, APPELLANT,

*vs.*

## I. M. SINGER, APPELLEE.    INTERFERENCE.

POWERS OF THE COMMISSIONER OF PATENTS—While the Commissioner must look to the statutes creating his office and defining his duties for every power which he can exercise, it by no means follows that every power and jurisdiction must appear upon the face of the statute in words of express reference and definition. It would be a strange construction of the law to require the Commissioner of Patents to issue a patent upon a state of facts which, when made apparent to a court of law or equity, would require the court to pronounce the patent utterly void. It is said that the law never requires vain things to be done; but to require the Commissioner of Patents to issue a worthless and void patent would be worse than vain—it would be to direct that persons should be armed with a warrant, under the great seal of the United States, to go into all the courts of justice in the land and hunt down their fellow-citizens with oppressive, idle, and vexatious litigation.

SM—ABANDONMENT—SECTION 7 OF THE ACT OF 1839 CONSTRUED.—Under the seventh section of the act of 1839 the Commissioner is authorized to reject an application upon proof that the invention has been abandoned to the public.

SM.—The meaning of section 7 of the act of 1839 is given by inverting the order of the parts of the section so as to read as follows : No patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application aforesaid, except on proof that such purchase, sale, or prior use has been for more than two years prior to said application for a patent, or by abandonment of said invention to the public.

ABANDONMENT—WITHDRAWAL OF APPLICATION—HOW REGARDED.— The withdrawal of an application and the return of the fee is not of itself an abandonment or dedication of one's invention to the public, but is an equivocal act, to be interpreted by surrounding circumstances, and to be affected upon a second application for the same invention by the subsequent conduct of the party—his diligence or his neglect and delay—in the same manner as his conduct is to be weighed in regard to an original application.

REJECTION OF APPLICATION WHAT—INFORMAL PAPERS RETURNED.—When application papers are filed without the due formalities required by law it is the duty of the Office (under the sixth section of the act of 1836) to decline to act upon them in their imperfect state; and this action on the part of the Office does not amount to a rejection of the application.

SECOND APPLICATION—WHEN WILL RELATE BACK TO PRIOR APPLICATION.—The doctrine, with relation to grants of the Government, that a subsequent

application may relate back to a prior application, so as to cut off intervening claims, will not be applied to a case which does not present the element of " due diligence in applying for and pursuing his application for a patent until he obtained the same."

DELAY IN PROSECUTING APPLICATION—MISTAKE OF THE OFFICE.—A mistake on the part of the Office in its judgment upon a case which does not create a delusion in the mind of the party as to his rights does not authorize him to indefinitely delay the further prosecution of the case, either by endeavoring to convince the Office on rehearing of a palpable error or by resorting to the easy and expeditious means for revising the decision upon appeal, as the statutes provide.

DUE DILIGENCE—POVERTY AS AN EXCUSE FOR DELAY.—The measure of poverty which one must possess before he is required to exercise any diligence to prosecute his rights is not to be found in the statute. It is an excuse very readily made, which yet should not be too readily listened to. If a man be utterly destitute of money and without friends, and incapable thereby of prosecuting an enterprise, much indulgence may be shown him; but when he has the means of carrying on sundry enterprises of a kindred sort, equally demanding money and friends, and does carry them on, his election to pursue those other enterprises will not be regarded in the law as an excuse for delay in the other, where valuable rights of others, equally meritorious with himself, and in the outset of their successful struggles, equally poor, are to be prejudiced.

PUBLIC USE AND SALE—CONSENT AND ALLOWANCE.—The acquiescence of an inventor in the public use of his invention can in no case be presumed when he has no knowledge of such use; but this knowledge may be presumed from the circumstances of the case. (Shaw v. Cooper, 7 Peters, 292.)

CASE STATED.—W. filed an application for the invention in 1850, which was at once returned to him as informal. In the same year he transmitted new drawings and specifications, omitting therefrom the invention in dispute. Upon further objection he withdrew the application in 1851, received the return fee, and took no further steps until he filed a new application, October 6th, 1858. S. made application for a patent in 1850, obtained a patent in 1851, and put the invention into extensive public use from 1853 on; of all of which facts W. was fully informed as early as April, .1856 : Held, W. had abandoned the invention by not using due diligence in applying for and prosecuting his application for a patent; that his application of 1858 did not relate back to the date of the original application, and that his right to the patent was barred by reason of the public use and sale of the invention, with his consent and allowance, more than two years prior to filing his second application.

Gaylor v. Wilder, 10 Howard, 476, considered and distinguished from the present case.

(Before MERRICK, J., District of Columbia, July, 1859.)

Mr. B. R. CURTIS, for the appellant, filed the following brief:

The grounds upon which the decision of the Acting Commissioner is rested are—

1. That he has jurisdiction to inquire, not merely whether the thing was in public use or on sale with the consent and allowance of the applicant, but whether the applicant had abandoned his invention to the public.

2. That the date, in reference to which the conduct of Wickersham is to be examined, is not the date of his original application, but of his renewed application, in consequence of which these proceedings are had.

3. That the evidence shows Wickersham did intentionally abandon his invention to the public.

4. If he did not intend to do so, his conduct before his present application, in judgment of law, amounts to an abandonment, irrespective of his intent.

We respectfully submit the decision of the Acting Commismissioner upon each and all of these points was erroneous.

As to the first: The Commissioner can have no jurisdiction, save what has been conferred by some act of Congress.

The seventh section of the act of July 4th, 1836, empowers the Commissioner to inquire, among other things, whether the alleged invention "had been in public use or on sale, with the applicant's consent or allowance, prior to the application." By the seventh section of the act of March 3d, 1839, the purchase, sale, or use of the invention during a period not exceeding two years before the application for a patent shall not invalidate the right, except on proof of abandonment of such invention to the public. This last-mentioned law is to be here noted as having two effects:

First. It modifies the act of 1836, so that the Commissioner must now inquire whether the alleged invention has been in public use or on sale, with the consent or allowance of the applicant, more than two years before the application for a patent.

Second. It shows clearly that, besides this inquiry, there is another distinct and different substantive matter which may exist, and, if it exist, will invalidate letters-patent, and that is an intentional abandonment of the right to the public.

I say an intentional abandonment, because this provision has frequently, and, so far as I know, always, been so construed; and

because, if it be not so construed, the entire provision would be inoperative, since a constructive abandonment by sales and use, such as was formerly held to be sufficient to defeat the right, without regard to the intent, of the inventor, was the very thing the statute was designed to guard against. The language of the law also indicates that no mere presumption of abandonment was to be thereafter sufficient. The exception is, "except on proof of abandonment to the public." Actual abandonment is to be proved. It is no longer to be inferred from sales or use, unless continued for more than two years before the application for a patent.

This statute does, therefore, in effect declare that sales and use, with the consent or allowance of the inventor, are one thing; an intentional abandonment to the public is another thing. They may exist separately. They are distinct subjects of inquiry.

This being so, the question recurs whether it has been made the duty of the Commissioner to institute both inquiries, or only one; and if one, which of them; and the act answers this question. He is directed to inquire whether the alleged invention had been in public use or on sale, with the consent or allowance of the patentee, more than two years before the application for a patent. This is all the patent acts require, and is all they allow.

An inquiry whether the applicant, though there have not been sales or use, with his consent and allowance, more than two years before the application, nevertheless intentionally abandoned his invention to the public, is a clear and manifest excess of power. For reasons not difficult to be perceived, Congress has reserved this inquiry as to the actual intent of the inventor, to be made by a judicial tribunal, proceeding according to the usual course of administering justice.

This is not the only instance in which Congress has made the intent of the applicant essential to the validity of his patent, but has not required the Commissioner to inquire into that intent.

Among the inquiries to be made by the Commissioner under the seventh section of the act of 1836 is this: Whether the thing had been patented or described in a printed publication in a foreign country. If he finds that it had not, he is not to inquire whether it existed in a foreign country before the alleged inven-

tion.   And yet, under the first proviso in the fifteenth section of this act, the defendant may show that it existed in a foreign country before the alleged invention by the patentee; and then the patentee must prove not only that he was an inventor, but that when he applied for his patent he believed himself to be the original and first inventor.   Indeed, looking only to this clause of the seventh section of the act of 1836, which empowers the Commissioner to inquire whether the thing was in public use or on sale with the consent or allowance of the patentee, and considering what the state of the law then was, it seems to be a necessary inference that the broad question of abandonment was not intended to be submitted to the Commissioner.

The law was then settled, and so continued down to the act of 1839, that if the invention was in public use by a fraud on the patentee, and without his consent or allowance, and he did not immediately assert his right to a patent, it operated as an abandonment without regard to his intent.   (Shaw *v.* Cooper, 7 Peters, 292.)   This harsh law the act of 1839 was designed to abrogate, but it existed when the act of 1836 was passed; yet that act, instead of empowering the Commissioner to inquire whether the invention was by any means in public use, and whether the inventor immediately asserted his right, only enabled him to inquire whether it was in public use with the consent or allowance (or, as the fifteenth section of the same act expresses it, the consent and allowance) of the inventor.   How, then, can it be that he may inquire whether it had been in public use, without the inventor's consent and allowance, prior to the application; and if not, how was the question of abandonment opened to inquiry?   The truth is, the act designed that one decisive mode of abandonment, which involved plain and palpable facts, should be inquired into.   Other modes of abandonment, depending on questions of fraud and intent, were reserved for investigation to the judicial tribunals, by whom alone they can be properly investigated.   Similar considerations have decisively influenced the action of the Lord Chancellor of England in granting letters-patent.   The practice is there settled that if a question like this is involved, the patent is to be issued, leaving the public to try the validity of the patent before the competent legal tribunals.   (*In re* Toulson's Patent, 6 De G., M. & G., 422; *In re* Russell's Patent, 2 De G., M. & G., 130; *In re*

Spence's Patent, 32 Law Times, 326.) The sensible reason assigned is, that if the petitioner is right, and failed in his application, he has no remedy ; but the opponents would have a complete remedy at law.

We respectfully submit that, for the above reasons, the Commissioner appears to have erred upon the first point.

II. That the date in reference to which the conduct of Wickersham is to be examined is not the date of his original but of his renewed application.

The first act of Wickersham in reference to this subject appears in the printed proofs, pages 40 to 45, inclusive. His petition for a patent bears date January 22d, 1850, and the accompanying specification is sworn to February 8th, 1850. The specification and drawings were returned to him with objections in pencil marks, which appear on page 45, accompanied by a letter from the Commissioner under date of February 20th, 1850, on page 46. Some correspondence followed; and on the 15th of March, 1850, Wickersham wrote to the Office and sent a corrected specification and model. (Pages 48 to 52.) These were returned to him, with a letter from the Commissioner of April 5th, 1850, containing a statement that, so far as his claims can be understood from his papers and model, none of them present anything patentable but the first. (See page 53.) It should be noted that this "first" is not either of the subjects now in question. So that this letter of the Commissioner informed Wickersham that neither of the subjects now in question was patentable, so far as he had developed them in his papers and model. That this was a mistake, must now be conceded ; for the report we are now considering shows clearly that the two things for which Wickersham is now soliciting letters-patent were sufficiently described ; and that they are patentable, is no longer doubted.

Controlled by this decision of the Commissioner, Wickersham, who was a very poor man, and entirely ignorant of this kind of business, withdrew his application and received back his money.

The application of Wickersham was renewed on the 6th of October, 1858, and forms the subject of this appeal.

Upon these facts, the question arises whether the words of the seventh section of the act of Congress of July 4th, 1836, "prior

to the application," refer to the original application for a patent for this invention or to the renewal of that application.

Upon this question, the report, confirmed by the Acting Commissioner, refers to the opinion of Judge Morsell in Mowry *v.* Barber (*ante*, p. 563) ; as to which it is suggested that the learned judge seemed to regard the renewed application as the date referred to by the act; but it is not suggested that the learned judge investigated the point.   Reference is also made to an opinion of Judge Leavitt; but it is very clear that the learned judge made no decision of this question, because he found that the original application had never been withdrawn.   The report adds that its authors have failed to find ayn authoritative decision of the courts which recognizes a distinction between a first and a second application.

Now if, in a case like this, the application referred to is not the original application, which it is now admitted did sufficiently disclose a patentable subject, and which failed to take effect by reason of a mistake of a public officer charged with the duty of giving effect to it, but what the law refers to is a renewal of that application, rendered necessary by that mistake, and so the inventor has lost his just right, every just mind must regret that the law of the case and the justice of the case are so widely different from each other.   I respectfully submit, upon authority and reason, that the law is not open to this reproach.

In Grant *v.* Raymond, 6 Peters, 218, the question was whether the Secretary of State could, on the application of the inventor, accept a surrender of a patent, invalid by reason of a mistake made by the inventor in his specification, and upon such application issue letters-patent on a new and corrected specification. This was in 1825, before any act of Congress had made specific provision upon the subject.   It was argued that the new patent must issue on the new specification, and on the application which accompanied it ; and that as the invention had been in use, with the consent of the patentee, before the second application on which the new patent issued, the new patent would be invalid.   In other words, the argument was the same as is made against Wicker-sham—that when the act speaks of the thing being not known or used "before the application" it means the application on which the patent actually issues.   But the Supreme Court decided other-

wise, and held that the application on which the patent actually issued might be considered as appended to the original application, and that the law was satisfied if the thing was not known or used before the original application.

The case of Wilder *v.* Edwards *et al.* came on for trial before the late Mr. Justice Woodbury and a jury at the October term 1848, in Boston. The undersigned was of counsel for the plaintiff; Mr. Choate and Mr. R. H. Dana were for the defendant.

Among the defenses set up to invalidate the patent was the sale by the patentee himself of the thing patented more than two years before his application. It appeared that Fitzgerald, the inventor and patentee, applied for a patent on the 1st day of April, 1836; that after some correspondence with the Patent Office he failed to obtain a patent, the Commissioner expressing an opinion that his alleged invention was not patentable; that he was a poor man, and, influenced by his want of money and the opinion of the Commissioner, he withdrew his application and received back his money in September, 1837; that he renewed his application on the 11th day of April, 1839, and was successful in obtaining a patent. And it was proved beyond a question that more than two years before the application on which the patent issued he had made numerous sales and that the invention had gone into use. Mr. Justice Woodbury held that upon these facts, if found by the jury, the two years were to be computed from the original application; and the patent was sustained. The defendants took a bill of exceptions, a copy of which, stating the facts and rulings, accompanies this argument, for the more full information of the court. No writ of error was prosecuted, and the case is not reported.

The same patent came before Mr. Justice Nelson and a jury in New York. The same facts appeared and the same ruling was made, as I was informed by Mr. Staples, who was one of the counsel. A note from Mr. Justice Nelson on the subject accompanies this argument.

These decisions of two eminent judges of the Supreme Court specially conversant with the patent laws of the United States are exactly in point.

Counsel is unable to perceive why that construction which the Supreme Court placed on the same words where a second.

application became necessary by reason of a mistake of the patentee himself should not be adopted where the second application is rendered necessary through the mistake of the public officer charged with the duty of securing the rights of the inventor. If, as Chief Justice Marshall says, (1 Peters, 242,) to correct even the mistake of the patentee is indispensably necessary to the execution of the solemn promise of the United States, how much more strongly must a sense of justice plead against the taking advantage by the public of a mistake made by its own officer. Nor can the public receive any injury from this construction. It may be suggested that if the patentee may sell after his original application he may lie by, and thus protract his exclusive right. To this it is sufficient to reply that if he does not withdraw his original application, the time when he is to receive his patent depends on the action of the Commissioner, and not on the will of the applicant; and that if he does withdraw it, and makes sales, his conduct is open to inquiry by every court into which he brings his patent; and if it shall appear to have been such as to amount to an abandonment, his right is destroyed. The public are therefore protected as fully as Congress intended; and at the same time the just rights of the patentee and the public faith, which is pledged for their protection, are not forfeited by mistake.

There is nothing in the language of this act of 1836, any more than of the prior act, construed by the Supreme Court in Grant v. Raymond, which conflicts with this construction. "The application" may refer to the original application, or to the renewal thereof. Either will satisfy the words. Good faith and a just regard to the rights of the inventor and the spirit in which the patent laws have been made and should be construed, all require that where the renewed application was rendered necessary by mistake, and especially by a mistake of the Commissioner, the original application should be deemed to be referred to.

If the court should be with us on the preceding points, it is not necessary to inquire further, because, if the broad question of abandonment was not opened by the law to the Commissioner, but only the question whether the thing was in public use or on sale, with the consent and allowance of the applicant, for two years before his original application, there can be no pretense for refus-

ing a patent to Wickersham, since there were no sales and no use before that application. But if both these questions should be decided against the views here maintained, then it must be considered—

III. Whether the evidence shows Wickersham intentionally abandoned his invention to the public.

It must be admitted the presumption is strong that no man intends to abandon anything he owns. This presumption may be overcome by proof; but the proof, to encounter it and work a forfeiture of the right, should be so clear and so strong as to enable the court to see clearly that Wickersham has intended to do something for which he had no motive and which men in general very rarely do. (See Wyeth v. Stone, 1 Story's R., 280; Curtis on Patents, sec. 57.) The question here is not whether, under the influence of one motive or another, he did or omitted to do something from which the law will infer abandonment; that is to be considered under another head; but the inquiry is whether he purposely and intentionally ceded and gave up to the public that which he knew belonged to himself. To make an ordinary grant effectual, the minds of the grantor and grantee must meet—the one accepting, the other ceding, the subject of the grant. In this case it is sufficient that the inventor should intend to give to the public his invention. Was there any such intent on the part of Wickersham? There are some facts shown by the evidence which have a material bearing on this inquiry.

Wickersham is shown to have been very poor and much embarrassed from 1849 to the time of this application. This is proved by numerous witnesses, who speak to decisive facts.   *   *   *
The truth is, that though temperate and frugal, he was not only very poor, but very much embarrassed. He was dependent on his labor for his daily bread; yet he spent his time and means in making and perfecting inventions; and, like most inventors, when he had completed one, he was impelled by a sort of fate, which often controls such minds, to bestow his thoughts and labor on another, picking up from some of them as well as he could a precarious subsistence. He had applied for a patent for the improvements. now in question in 1850; he was too poor to employ a person skilled in the art to make his specification and drawings; he was told by the Commissioner they were unintelligible; he

saw it would be useless for him to repeat the trial, and he had not means to have others to try for him; he submitted to the disappointment as well as he could, and went, as he was obliged to do, about something else with which his brain was teeming and from which he hoped for bread. When it is remembered that he was entitled to a patent, and ought to have had one, and would have had one but for the want of attention or discernment of the Commissioner, it does seem that, as between him and the public, it would be but bare justice to make all reasonable presumptions in his favor; that astuteness in picking flaws in such a title is hardly consistent with the public faith; and that, least of all, should inferences against him be drawn from the evidence which are not necessary or even reasonably consistent with the proofs. The thing to be proved is that he intended to abandon his invention to the public. There is no direct and positive evidence of this intention. Circumstances are relied on to prove it. These circumstances are—1. His lying by for such a length of time. 2. The fact that these improvements were patented by Singer and put in use by him. 3. The presumption that Wickersham knew they were thus patented and put in use. 4. The evidence that he had forgotten these improvements.

Now, there are two cardinal rules respecting circumstantial evidence. The first is, that each circumstance relied on must be proved to have existed; the second, that each circumstance separately, and all collectively, must not only be consistent with the hypothesis to be proved, but not reasonably consistent with any other hypothesis. By the light of these rules let us examine these circumstances. Each and all of them are as consistent with, and as fully accounted for, by his inability during that period further to prosecute his claim, as with his wish and intention to abandon it to the public. If he was poor and embarrassed to the extent shown, if he was forced by his genius and wants to go from one project to another, how does this compulsory cessation of his efforts and withdrawal of his mind from what he had perfected prove his intention to give it away.

But suppose Wickersham did get knowledge of Singer's acts— for Singer alone put these improvements in use—how does it tend to prove an intentional abandonment to the public that the first inventor knows that a subsequent inventor has patented the

invention and is using and selling it? I can perceive how such acquiescence, when carried far enough, may amount to an implied license to the particular person who thus acts, as was held in McClurg v. Kingsland, 1 How. R.; but how is it any acquiescence in the use by the public? The second inventor is claiming an exclusive right. The public are not in possession. It is a question between two inventors, and not between one of them and the public, who neither claim nor enjoy any right to use the thing. An intention to dedicate to the public a right belonging to the inventor may sometimes be inferred from his acquiescence in the enjoyment by the public of his right; but how it is to be inferred when the public have never enjoyed it, I am not able to perceive. But suppose this not sufficient; still the inability of Wickersham to act, by reason of his proverty, becomes still more marked and satisfactory when it is remembered that what he had to do was not merely to obtain means to solicit his patent, but to carry on a contest with Singer, a man of known wealth and influence, and who had already obtained a patent for the same things. Wickersham was utterly unable to do this, and would have continued so if he had not been at last able to satisfy those who have means of the value of the invention and the justice or legality of his claims. Great stress is laid by the report upon the fact that Wickersham did not tell Potter in 1856 that he had made these particular improvements, and had then apparently forgotten them; and it is asked how this consists with his intending to recover the rights abandoned in 1851. If it be assumed that these rights were abandoned in 1851, no further inquiry is necessary. Whatever may have been his strength of memory or persistency of intention, rights once abandoned to the public could not be recovered. If it be assumed that a man intends to abandon all rights which he does not, at some particular time, remember he owns, then the inquiry is important; but if the continued ownership of property does not depend on the strength of memory of him who created it; if it does not become public simply because by a visitation of Providence, or from natural constitution of mind and the pressure of want and cares, the creator of property has ceased to remember its existence,—then the inquiry does not seem to be important. This is not a case in which continual claim must be made to preserve a right. The inventor need make no claim until years after

his invention, nor at all, unless the public gets into possession, nor then, till after the lapse of one year and three hundred and sixty-four days. And how can he be said to have intended to abandon what he does not remember he owns?

[The remainder of the argument upon this head has been omitted.]

Mr. CHAS. M. KELLER, for the appellee, filed the following brief in reply:

It will be contended on the part of the appellee that the statute confers upon the Commissioner of Patents full authority to refuse the grant of letters-patent when he is satisfied that the applicant, being the original and first inventor, has by any act, either of intention or neglect, suffered his invention to pass to the public.

The scope and purpose of the statute is to confer upon the Commissioner authority to grant letters-patent only to those who can legally hold them when granted; and if the Commissioner of Patents be possessed of any fact on the examination of an application which in judgment of law would, in a court of law or equity, invalidate letters-patent when granted, it is his duty, under the statute, to refuse the grant.

The intention of Congress in enacting the existing patent laws is best ascertained by a comparison of the existing with the repealed statutes and by a review of such of the defects of the old statutes as led to the repeal of them by Congress.

Under the acts of Congress in force prior to July 4th, 1836, there was no adjudication of the claimant's right to receive a patent as prayed for, except in the case of interfering applications. In such cases the right to receive the patent was first determined by arbitration. (Act of 1793, sec. 9.)

The granting of letters-patent in all other cases was purely a ministerial act, and the sole duty was simply to see that certain formal requirements of the statute were complied with, such as the payment of the duty, the presentation of a petition, sworn specification, and drawings. The theory of the law prior to the act of 1836 was that the declaration of the applicant that he was the true and first inventor, and that he had fairly distinguished his invention from all other things before known, should be sufficient evidence to justify the issuing of letters-patent, the validity

of the grant being dependent upon the truth of these allegations, to be determined, as at present in England, by judicial proceedings whenever the patentee should seek to enforce his patent. It never was in contemplation of law that any one should receive a patent under a state of facts which, if put in evidence in a judicial proceeding, would invalidate it; and the acts of Congress prior to the act of 1836 merely established that the *ex-parte* declaration of the applicant should be received as evidence sufficient to make the grant. But in the case of conflicting applications, as both statements could not be true, it was necessary to determine by arbitrament which was true. The arbitrators appointed for the purpose were clothed with full powers to determine which should receive the patent. It will be seen presently that this has an important bearing upon the questions under discussion. This mode of granting patents was attended with many evils, and I will refer to one only, as that will be sufficient for the purposes of the argument.

The grant of letters-patent to any one upon a mere *ex-parte* declaration resulted in numerous grants which were utterly void; but, nevertheless, such patents conferred upon the patentees the right of action against any one who should be found using the things so patented; and in many instances patents so obtained were used to oppress the community by threats of prosecution for infringement; and as litigation in such matters is attended with serious expense, it frequently occurred that large sums were paid to avoid the heavy expenses and trouble of litigation. (See the report of H. L. Ellsworth, superintendent of the Patent Office, and the report of the Senate committee for the session of 1835 and 1836.)

The act of July 4th, 1836, inaugurated a new system directly the reverse of this. It conferred upon the Executive branch of the Government authority to determine before granting letters-patent whether the party making application therefor is legally entitled to hold such a grant—authority to adjudicate the application, not only as between the applicant and the public, but also as between conflicting claimants. And to guard against Executive error or oppression, the acts of Congress have put this adjudicating Executive authority under the supervision of the judiciary; for, by reference to the statute, it will be seen that any and all

adjudicating acts of the Commissioner can be brought by appeal or by bill in equity under judicial supervision. (Act of July 4th, 1836, secs. 7, 8, 16; Act of March 3d, 1839, secs. 10, 11.)

It is contended on the part of the appellant " that the Commissioner can have no jurisdiction save what has been conferred by some act of Congress." This is granted ; but the scope of the jurisdiction so conferred is to be determined by a fair construction of the act; and in doing this, it is important to ascertain the intention of Congress in giving the jurisdiction. In this inquiry the history of the act itself and the provisions of previously-existing acts have an important bearing—nay, these are indispensable to a sound construction.

Now, as it was obviously the intention of Congress, as manifested by the act itself, as well as by the history of its enactment, to test the right of a party to letters-patent before making the grant, it is a fair presumption that the Commissioner of Patents, who primarily is to execute this congressional will, is clothed by the statute with full authority for the purpose. To say, in view of this obvious intendment of the statute, that the Commissioner of Patents is bound to make a grant with full knowledge that when made it will be invalid, is to assert that the statute is a contradiction. If the letter of the statute were so contradictory by well-established rules of law, it would become a duty so to construe its several provisions as to make them harmonize with the general scope and purpose ; but on review it will be found that there are no such contradictions.

The seventh and the fifteenth section of the act of 1836—the one defining the grounds on which the Commissioner may grant or refuse to grant letters-patent, and the other enumerating the defenses which may be set up in an action under letters-patent— will be found to accord in all substantial respects, except so far as the fifteenth section provides for defenses arising out of the acts of the patentee after the grant of the letters-patent. Neither of these sections enumerate intentional abandonment as a bar either to the grant or to the validity of letters-patent, and yet abandonment is recognized as a good defense, and so the courts have repeatedly ruled. This defense, although not enumerated among the defenses in the fifteenth section, necessarily grows out of the nature of the grant, and is a part of the common law.

What has been given to the public cannot be recalled without the consent of the public, who have been made the recipients of the gift. What has passed to the public the courts cannot adjudge to belong to the former proprietor. By the same process of reasoning, after an inventor has permitted his invention to pass to the public, it is not in the power of the Commissioner to confer it upon a private individual. That would confer upon the Commissioner power to grant the most odious of all monopolies.

The grant of letters-patent is in the nature of a contract between the inventor on one hand and the public on the other. The protection of the Government is pledged for the period of fourteen years, in return for an invention, which is to pass to the public at the end of that term. But if the invention, by abandonment, has already passed to the public, the inventor has no consideration to give; he is not in a condition to initiate the contract.

The Commissioner, before making the grant, must be satisfied that the invention which the applicant claims is his; not simply that he first invented it, but that it is his at the time of making the contract. This is a condition precedent which the Commissioner cannot disregard.

But it may be said all this is true as regards the validity of the patent after it shall have been granted, but the seventh section does not give the Commissioner jurisdiction of this matter. We know, however, that it is not made a matter of defense by the statute, and yet the courts have taken jurisdiction, and have always held abandonment to be sufficient to void a patent. It grows out of the nature of the property, and it is as necessary a condition to a claim for a patent as it is to the legality of the grant when made.

The differences between the seventh and the fifteenth sections, as I have before stated, are merely formal, with the exception before stated.

According to the terms of the seventh section, the Commissioner shall make an examination, not merely of the alleged invention, but of the alleged "new invention or discovery." The applicant must allege, not only that it is his invention, but that it is new; and this is a necessary averment of the application. Now, can it be pretended that the Commissioner has no authority to inquire

whether this averment be true? Suppose Robert Fulton to be now living, and that he should make application for a patent for his invention of the steamboat, which he never did patent. He could allege with truth that it was his invention, but not that it was a new invention. On examination, the Commissioner would refer him to the history of the past fifty years for evidence that he was not the first inventor, and that if he was, he had suffered it to go into public use. If to this he should reply by evidence, "I invented it in the year 1801, made numerous experiments, and then necessity compelled me to leave for Japan, where I have been until lately"—on these facts the Commissioner would be compelled to grant a patent, according to the construction of the act urged on the part of the appellant. But on a reasonable construction of the act the Commissioner could avoid this obvious wrong to the public on the ground that, although his invention, it is not *new*, and cannot be truthfully alleged to be new; and having been abandoned to the public, was no longer his, and could not be secured to him without taking from the public that which they had long possessed.

It will be observed that the phraseology of the seventh section is peculiar: " Shall make an examination of the alleged new invention or discovery; and having examined into the truth of this allegation, if, on any such examination, it shall not appear," &c. He is then to proceed to the other inquiries, all of which go to show that it was the obvious intention of Congress to give to the Commissioner the same jurisdiction over the claim to a patent which the courts exercise over the validity of the grant when made.

The leading argument of the distinguished counsel for appellant on this reason of appeal is that the authority of the Commissioner on the question of abandonment is derived from the seventh section of the act of 1836, and that it is limited to the inquiry whether the alleged invention "had been in public use or on sale, with the applicant's consent or allowance, prior to the application; and that by the seventh section of the act of 1839 this was enlarged to a period not exceeding two years before the application." He argues that the enlarging provision of this section of the act of 1839 applies to the jurisdiction of the Commissioner,

but that the limitation expressed by the words "except on proof of abandonment of the invention to the public" does not apply.

Now, upon this distinction I beg to take issue. The position of the counsel is unsound in law, and the argument in support of it illogical. The whole tenor of the argument is that the statute presents two distinct subjects of inquiry, namely, the one being public sale and use, with the consent and allowance of the inventor, and the other intentional abandonment; and that the Commissioner is directed to make the inquiry where there have been sales or use, with the consent and allowance of the applicant, more than two years before the application, but that the inquiry by him into the question of intentional abandonment is a clear and manifest excess of power ; that Congress reserved this inquiry to be made by a judicial tribunal.

· It will be seen that, so far as regards the question of abandonment in the act of 1836, the provisions of the seventh and fifteenth sections are identical. If on examination the Commissioner finds that the invention was in public use or on sale, with the inventor's consent and allowance, before the application, he is required to refuse the grant; and the same facts are constituted a legal defense in an action under letters-patent.

The point made on the other side is that the Commissioner can exercise no power not expressly conferred by the statute. If that be true as to the power to reject, it must be equally true as to the power to grant. Of this there can be no doubt; but if questioned, a simple reference to the seventh section will show that the two powers are equally granted.

Now it will be observed that the learned counsel not only admits, but insists, that by the provisions of the seventh section of the act of 1839 the authority of the Commissioner to refuse the grant by reason of public use or sale is modified; that instead of rejecting the application, if he finds that there was a public use or sale before the application, he must now find that such public use or sale, with consent or allowance, was for more than two years before the application. Turning to the seventh section of the act of 1839, it will be found that it contains no reference in terms to the jurisdiction of the Commissioner. After enacting that any person, &c., who shall have purchased or constructed any machine prior to the application for a patent shall continue to exer-

cise the right to use and vend the said machine without liability to the inventor, the section proceeds : "And no patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application for a patent, as aforesaid, except on proof of abandonment of such invention to the public, or that such purchase, sale, or prior use has been for more than two years prior to such application for a patent." The letter of the whole of this clause relates to the validity of letters-patent. "And no patent shall be held to be invalid by reason of such purchase," &c. But notwithstanding this limitation to patents, the learned counsel knew full well that the spirit of this clause is equivalent to a repeal of a portion of the stringent provisions of the act of 1836, and that by force of construction it would be construed as being applicable to the jurisdiction of the Commissioner under the seventh section of the act of 1836, as well as to the defenses provided under the fifteenth section of that act ; for it would be absurd to suppose that Congress, in enacting an amendment to the act of 1836, providing that thereafter no patent should be held void because of a public use or sale before the application, except on proof that such public use or sale has been for more than two years before the application, and at the same time require the Commissioner to continue to reject applications for patents when he finds that there has been any public use or sale before the application. No such inconsistency can be presumed of any act ; and in this respect the learned counsel for appellant fully concurs with the views I am endeavoring to present ; but beyond this it appears we are at issue. He divides the clause in question, and makes two separate provisions of it, and by a singular mode of construction makes one of them, and not the other, modify the seventh or jurisdiction section of the act of 1836, and the other two as modifying the fifteenth or defense section ; and although he supports this singular construction by a very ingenius argument, he is careful not to refer to any known rule of construction in support of his views. He says that this act of 1839 has two effects : First. It modifies the act of 1836, so that the Commissioner must now inquire whether the public use or sale, with consent, has been for more than two years before the application. Second. It shows clearly that, besides this inquiry, there is another distinct and different substantive matter which

may exist; and if it exist, will invalidate letters-patent; and that is an intentional abandonment of the right to the public. And from this he passes to a distinction between an intentional and a constructive abandonment; and that under this act of 1839 there can be no presumption of abandonment; that actual abandonment is to be proved. And from all this he draws the corollary that this statute does in effect declare that sales and use, with the consent and allowance of the inventor, are one thing, an intentional abandonment to the public is another thing.

From this last enunciation the learned counsel argues that the inquiry as to the public use or sale for more than two years before the application, the Commissioner is authorized to make ; but as to the other your honor, is informed that, "for reasons not difficult to be perceived, Congress has reserved this inquiry as to the actual interest of the inventor, to be made by a judicial tribunal, proceeding according to the usual course of administering justice."

I have thus carefully restated the points and arguments on the part of appellant that I may fairly meet them if I can. And first, as to the distinction between what the learned counsel is pleased to call a presumptive abandonment and an intentional abandonment. By a presumptive abandonment he means, I presume, an abandonment which is to be presumed from the inventor's sale or knowledge and consent to the public use by others for more than two years before making application ; but I submit that this is not a presumptive abandonment. It is a forfeiture of right, whether the delay be the result of intention, ignorance, or negligence, and whether on the examination of an application, or on a test of the validity of a patent granted, the fact to be proved is, whether the sale or public use, with the consent and allowance of the inventor, has been for more than two years before the application. The fact may be very difficult of proof, but when clearly proved, that works a forfeiture of right. But on the trial of this question the presumptions are all in favor of the inventor as the original and first inventor, and as such entitled to the protection of letters-patent. On all established rules of law, applicable alike to all questions of abandonment, the presumption is that he did not intend to abandon, and in consequence the facts which work an abandonment in judgment of law must be clearly

proved.    There is no other presumption, and none can be shown to have been recognized by any tribunal.

What the learned counsel terms intentional abandonment he derives from what he terms the exception.    He gathers this exception from the words of the clause in question, namely, except on proof of abandonment of such invention to the public.

I beg to take issue with the learned counsel, first, as to this being necessarily an intentional abandonment; and secondly, as to its being an exception to the previously well-known rules of abandonment well known to the common law.    It has always been the law that there may be a dedication or abandonment of any invention to the public other than by the public use or sale, with consent and allowance.    A use or sale by others without the knowledge and consent of the inventor, or by fraud alone, never has been considered an abandonment; but such use or sale, whether by fraud or otherwise, will work an abandonment if the inventor does not assert his right within a reasonable time after it comes to his knowledge.

Under the acts of 1793 and 1836 such neglect any time before the application would work an abandonment; and by the act of 1839 this has only been so far modified that the public use or sale, with the inventor's consent, must be for more than two years before making application for a patent.    A publication to the world without assertion of right would be a dedication to the public.    Knowledge that another party has patented the same invention, without an assertion of claim to the invention within a reasonable time, would be an abandonment; for all these are acts which may mislead the public into the belief that the invention is public property, or vested in another, and large investments may be made by innocent parties, who may be deceived by the non-assertion of claim to the invention; and when the right has once passed to the public or to another, it cannot be reclaimed. And there is no standard case within my knowledge which has ever ruled that the intention to abandon must be proved.    The intention will be inferred as well from the proved conduct of the inventor as from his declarations, and such is the doctrine of the cases of Pennock v. Dialogue, 2 Peters, and of Shaw v. Cooper, 7 Peters, 292.    But as these are cases under the act of 1793, I beg to refer your honor to the rulings of his honor, Mr. Justice

Curtis, in the case of Winsor *v.* Kendall *et al.*, tried in the Circuit Court for the District of Rhode Island. This ruling was affirmed by the United States Supreme Court at the last December term, and will be found in the 21st of Howard, 322, which I understand is just issuing from the press.

. In this case the learned judge instructed the jury in these words, namely: "But if the plaintiff did intend not to take a patent, and manifested that intent by his declarations or conduct, and thereupon it was copied by the defendants, and so went into use, the plaintiff could not afterwards take a valid patent." In another branch of this case I shall take occasion to recur to this ruling to show that the appellant is not entitled to a patent under this ruling, affirmed as it has been by the Supreme Court. But to return. Here it will be seen that the intentional abandonment may be deduced from the conduct of the inventor as proved; and this ruling was made in view of the seventh section of the act of 1836.

As both classes of abandonment are matters of proof, and in both the act of abandonment may be inferred from the conduct of the inventor, as proved, I submit that the learned counsel has failed to make out from the distinctions a necessity of the law for withholding one of them from the Commissioner, particularly in view of the other provisions of the statute which give to the defeated applicant a remedy, first, by appeal from the Commissioner, and afterwards he still has another remedy, and that is the filing of a bill in the United States Circuit Courts for the repeal of the patent, which will bring up the whole matter for adjudication.

After failing to show that there is any difference between the defenses of the fifteenth section and the jurisdiction given in the seventh section of the act of July, 1836, he seeks to show that there is another distinction between the provisions of these two sections. But in this he is equally unhappy. The counsel tells your honor that among the inquiries to be made by the Commissioner under the seventh section of the act of 1836 is whether the thing patented had been described in a printed publication in a foreign country, and that if he finds that it had not, he is not to inquire whether it existed in a foreign country before the alleged invention; and yet he says under the first proviso in the

fifteenth section of this act the defendant may show that it existed in a foreign country before the alleged invention by the patentees; and then—mark this—the patentee must prove not only that he was an inventor, but that when he applied for his patent he believed himself to be the original and first inventor.

This position is not, I submit, fairly derived from the statute. Such is not the good sense of the statute provisions. Under the seventh section the Commissioner is to inquire whether the alleged invention had been before invented or discovered by any other person in this country, or that it had been patented or described in any printed publication in this or any foreign country, &c.; and if not, he shall grant the patent.

Now there is no matter better understood at this day than the manner of pleading and the course of evidence in patent causes. The patent is *prima-facie* evidence that the patentee is the original and first inventor of what is claimed as new, and that the patentee believed himself to be the original and first inventor, and that he does not know or believe that the same was ever before known or used; and it is so made *prima-facie* evidence because the applicant, before he can receive a patent, is required by the sixth section of the act of 1836 to swear to these allegations, and because the Commissioner is empowered on examination to refuse a patent if he finds that when granted it would not be valid. (Burden *v.* Corning, 15 Howard, 252–271.)

If the defendant attacks the validity of the patent for want of novelty in the alleged invention in putting in his evidence, he is not permitted to do what appellant's counsel says he can do, namely, show that the invention existed in a foreign country before the alleged invention by the patentee, unless he can also show that the patentee had knowledge of this fact, because such evidence could not invalidate the patent; and no court will permit that to be proved which, when proved, can have no bearing upon the issue. The defendant must first overcome the *prima facies* of the patent; and before he can be permitted to prove any prior knowledge in a foreign country of the thing patented, it is clear that he must disprove the evidence of the patentee's oath on which the patent was granted. It must be obvious that the counsel is in error, for if the defendant be permitted to prove the prior use of the invention in a foreign country, how can the patentee

plaintiff overcome this? He is the only one who can know whether at the time of making application he believed himself to be the original and first inventor; and the oath to that effect he made on presenting his application, and that formed part of his *prima-facie* case in the opening. It is obvious that in this respect the provisions of the seventh and fifteenth sections are the same, and that in drafting the act the form of a proviso in the fifteenth section was adopted, the better to insure the clear sense of Congress, that the fact of a prior knowledge of the invention in a foreign country should not invalidate a patent, except on proof that such prior foreign invention was either patented or described in some printed publication, for such patent or publication in evidence would not be subject to the prejudices and errors of memory, which render the testimony of living witnesses as to such facts so unreliable. The effort to mark a distinction in this respect between the two sections of the act is condemnation strong of the views urged on the part of the appellant.

The leading error of the learned counsel's argument is to be found in the misconstruction of the seventh section of the act of 1839. The clear object of that section was to relieve inventors of the stringent provision of all the previous patent acts in reference to a forfeiture of the right by a public use or sale, with the consent and allowance of the inventor, before the application. And in providing this relief, public policy and common justice required that persons who became possessed of a newly-invented machine, with the knowledge and consent of the inventor, before application for a patent, should be protected in the continued proprietorship of such machine after the grant. The section, after making provision for the protection of such use or sale before application, then provides for saving the rights of the inventor by reason of such public use or sale, with consent and allowance, before the application. And as such relief from the restriction of the previous laws, unguarded, might be construed into a virtual repeal of all existing laws on the subject of abandonment—and it was obviously necessary to put some limit to such public use or sale before the application for a patent—a limiting clause was put in, which virtually says to the inventor, We will allow you to use, and to sell to others to use, or to permit others to construct, your invention before making application for a patent, without destroy-

ing your claim to letters-patent; but in doing this, you must understand that you must not in the meantime abandon your invention to the public; your declarations and conduct must not be such as to induce the public to believe, so that they might act on that belief, that you do not mean to patent this invention, or that you do not claim it as your invention. So long as you observe this prudence, and deal in it as your invention and your property, you may, for the period of two years, delay making application for a patent without forfeiting your right to a patent; but if you overstep these boundaries, your rights shall pass to the public. And the clause virtually says to the Commissioner: Hereafter, on the examination of an application, instead of determining whether the invention has gone into public use, or has been sold, with the consent and allowance of the inventor, before his application, you will inquire whether there be proof that he has abandoned his invention to the public, or whether there be proof that this public use or sale, with his consent, has continued for more than two years before his application; and if you find either of these conditions proved, it will be your duty to reject the application. And in the same terms the statute is addressed to the judicial tribunals. The terms of the said clause are in strict conformity with this purpose; "and no patent" or claim for a patent shall be held to be invalid by reason of such purchase, sale, or use, prior to the application for a patent, except on proof of abandonment of the invention to the public, or on proof that such purchase, sale, or prior use has been for more than two years before the application. This, I submit, is the good sense of the clause. It is in harmony with the general purpose of the act of 1836 and with sound policy. It does not give to the Commissioner authority to refuse to grant, because of the existence of some facts which would invalidate the grant if made, and direct him to make a grant in the face of proof of other facts which would be equally fatal to the grant when made.

Finally, on this question of jurisdiction it has heretofore been intimated that his Honor Judge Cranch ruled in the case of Heath v. Hildreth (ante, p. 12) that the Commissioner has no jurisdiction of the question of the abandonment. This very case was cited to his Honor Judge Morsell in the case of Ellithorp v. Robertson (ante, p. 585); but after fully considering the opinion in

Heath *v.* Hildreth, came to the conclusion that this question was not there decided.  * * *

It is clear that the learned counsel for appellant failed to notice, as his Honor Judge Cranch failed to notice, that this was a case of interference arising under the eighth section of the act of 1836, instead of the seventh section, and that under the eighth section the jurisdiction to determine the right as between the two parties must, from the very nature of the case, be general, as it was under the arbitration section in the act of 1793, before referred to.  The authority to determine all questions that can affect the legal title must be given to the tribunal that is required to determine which of the two parties claimant is legally entitled to the grant; otherwise this tribunal might, by reason of its restricted jurisdiction, determine that A is entitled to receive the grant ; and after the making of the grant it might be declared void by a judicial tribunal, for the very reason that B was the party entitled to the patent, in judgment of law and fact, and when it has become too late to confer the grant upon B.  If there be any power to adjudicate conflicting claims to the grant, the act, to be consistent, must authorize this adjudication to be determined by all the rules of law which are to control the grant when made.

Under this state of facts, the question is whether the Commissioner, in determining that the invention was in public use, with appellant's consent and allowance, more than two years before his application for letters-patent, should have determined that this must be considered with reference to the application filed on the 6th of October, 1858, and now at issue.  In other words, must this public use have been for more than two years before the present application now at issue, or before the application of 1850, which was withdrawn unconditionally in 1851.

On the part of appellee it will be contended, not only that appellant cannot be permitted to state his present application back to the application of 1850 to avoid the legal consequences of laches on his part, but that the unconditional withdrawal of his application in 1851 was in itself an abandonment of his invention to the public.

In deciding the first branch of this proposition against appellant, the Commissioner of Patents says that he conformed to the rule previously established by his Honor Judge Morsell in the

case of Mowry *v.* Barber (*ante*, p. 563). I have not a copy of this opinion, and I am not, therefore, competent to form an opinion of the points decided by his Honor, but presume that the Commissioner of Patents, before relying upon it as an authority, was careful to ascertain its real scope.

The facts in evidence clearly show that there was no actual rejection of the application of 1850 either in its first or amended form—a mere suggestion that, so far as the matter, in the defective form in which it was presented, did not appear to present patentable novelty in all the claims presented, cannot be termed an authoritative rejection such as the seventh section of the act of 1836 defines.

But assuming, for the purpose of the argument, that this was a rejection of the application, and made in error, the next question which arises is whether, to preserve his rights, appellant was not bound to exhaust the remedies afforded him by the statute. He had the right of appeal, to which he did not resort. On the rejection of an application the statute presents to the applicant one of two alternatives, namely—to elect either to abandon the matter or to prosecute his claim by appeal; and to these the practice of the Patent Office since 1836 has virtually added a third, namely, perpetuating his claim by renewing his application on the basis of the first and insisting that there is error in the judgment of the Commissioner. Appellant did not resort to either of the two latter, but, instead, elected to abandon his invention by an unconditional withdrawal, and filing a notice of this election entered of public record, relinquishing his right to the model, and receiving back part of the duty paid into the Treasury. In what manner can an inventor more distinctly announce an abandonment than by such a notice? I submit that a notice of abandonment published in a public journal could not have a stronger legal force to work an abandonment than this written notice filed in the public records of the Patent Office. The model from that time became public property, to be thereafter exhibited as public notice of the abandonment of the invention to the public. The requirement of the statute as to the relinquishment of the model means something. It cannot be a requirement without intention, and the intention must be to notify the public that thereafter the invention which was described in that application, so far as it

contains anything first invented by the applicant, has been abandoned to the public. There can be no other purpose, and none other is suggested by appellant's counsel. Here, then, is an entire relinquishment of the remedies provided by the statute, and a complete relinquishment of all right. Can the applicant at any time thereafter renew that application? Clearly not; because the conditions of an application require the presentation of a model ; and having relinquished his claim to the model-making part of that application, it is no longer his to present. It cannot be said that it was the intention of Congress that after such a withdrawal the party should be at liberty to renew that identical application, for no such construction can be given to the act upon any assumption ; and by a familiar rule of law, property which once passes to the public cannot be reclaimed. On no condition can it be reclaimed. No circumstance, not even that of extreme poverty, so eloquently urged by appellant's counsel, can justify the restoration, for Congress cannot have intended that the progress of improvements should stand still to suit the convenience or even the poverty of any one man ; and unless Congress contemplated such an absurdity, the law cannot be presumed to contain a provision for such a special case of hardship; and it follows necessarily from this that unless that application, so voluntarily and unconditionally withdrawn, can be restored to its original condition, some other application must be made, and all the acts of the applicant must relate to such other application. There must be a new start. That first application undoubtedly can stand as proof that at that time an invention was made and described, but so far as regards evidence of a continued intent to patent it, it has lost all power; for if it proves anything, it proves the relinquishment of such intention. Under no circumstance can there be a return to that original and withdrawn application, as the basis of the present, to avoid laches, except by proof that the intention to prosecute it was never abandoned; for an abandonment of that intention at any time breaks the continuity and makes the two applications separate and distinct transactions without legal relations the one to the other. That there was no continuity of this purpose, is proved, first, by the unconditional withdrawal of the first application, and second, by the testimony of Mr. O. B. Potter, who testified that

in the spring of 1856 appellant did not remember what that application contained. It is clear, therefore, that the acts of abandonment must in judgment of law relate to the application of 1858.

The learned counsel for appellant has referred to, certain cases with the view to show that the present application may relate back to the first; but neither of these cases have the most remote analogy to the point in question. The case of Grant v. Raymond relates to the question of the surrender of a defective patent to obtain a reissue on an amended specification of the same invention. In that case a patent was actually granted on the first application, and by inadvertence and mistake the specification was defective. The patent was surrendered, and the original grant amended by a reissue of it relating back to the original grant; and the courts held that all acts of abandonment must have relation back to the original application; for it was clear that there had been no abandonment of the right either by intention or by neglect. The surrender of the old patent was for a declared purpose, and that purpose a correction of technical errors in the original title deed. At no period could an abandonment have been inferred from the acts of the patentee.

The next case referred to is one which has not been reported; and I have no opportunity of examining it, no copy having been furnished to me with the argument; but I know the facts, if properly reported, as I was in the Patent Office during the whole time of the occurrences, and the facts must be the same as in the next case referred to of Wilder v. Gaylor, tried before Mr. Justice Nelson, and afterwards affirmed by the Supreme Court. The case as tried before Mr. Justice Nelson is not reported, but the writ of error tried in the Supreme Court is reported in 10 Howard, 477. I am unable to find that there was any exception to the rulings on the question of abandonment or of the delay in granting the patent. From my recollection of the facts, the application was pending in several forms before the Patent Office from 1836 to 1843, when the patent was finally granted. But instead of this case being in point, there is no case which furnishes stronger evidence of a determined persistence on the part of the applicant in urging the grant of a patent. The application was repeatedly rejected, and as often renewed, the old one withdrawn, but on every occasion substituted by a new application,

43

until finally the patent was granted. And this is attempted to be compared as a precedent to the present case, in which there was no official rejection, but a voluntary and unconditional withdrawal and abandonment of all efforts to get a patent for many years, and until the great success of a rival claimant and the almost universal use of the invention throughout the country started a spirit of speculation either in the mind of appellant or of some other persons.

[The remainder of the argument upon this head is omitted.]

The third reason of appeal charges that the Commissioner erroneously decided that Wickersham had abandoned his invention to the public, and therefore was not entitled to a patent.

Under this reason of appeal, the learned counsel for appellant arranges the third head of his argument, namely, "whether the evidence shows Wickersham intentionally abandoned his invention to the public."

It is conceded that the presumption is that no man intends to abandon anything he owns; but there is a broad difference between the abandonment of a realized successful invention and an inchoate invention, and the mind is often struck with amazement in tracing the history of inventions and their rise and progress, at first no one having faith in the ultimate success, and then, after years of struggling on the part of the inventor, sometimes aided by a small capitalist, more bold than the rest and less tenacious of his gold, and after success has smiled upon the forlorn hope, to see the universal faith developed, no one supposing for a moment that there was ever a doubt.

On the supposition that Wickersham did invent what the Commissioner's decision has awarded, and looking at that invention through the medium of its present successful condition, it would indeed be difficult to presume, nay, it would be impossible, with such rights, to presume, that he, being the first inventor, and having the privilege to secure the exclusive right to himself, meant to abandon such right and bequeath such wealth to the public. This is the medium through which the learned counsel for appellant presents this question to your honor's consideration. The question is whether, in view of this state of things, without a single true conception of the value of this invention, he intended to abandon it, either when he cancelled the specification

and drawings in which it is said it was described and represented, or when he finally withdrew his application ; or, later, when he was pursuing a different channel of thought, whether at any of these periods, or later, he intended to abandon this improvement. That is the inquiry, and not whether he intended to abandon a grand realized idea, for with him it never was realized.    It never was carried far enough ; and so little impression did it make on his mind, that when informed by the Commissioner that in his application for a patent he must limit himself to one of the several methods, he expunged the very one now said to be at issue, and retained the other, so worthless that its duplicate has never been made.

But to return : Is there any process of reasoning which can make the intentional abandonment more clear than a simple narrative of what is proved?    It is said that a self-evident proposition does not admit of being argued ; and yet it seems to me that appellant's counsel has argued against such a proposition.    What is an intentional abandonment, if a voluntary cancellation of the only specification and drawings describing and representing this improvement, and the final withdrawal of the application, be not each of them such an abandonment?    If he had never made application for a patent for these improvements, the counsel's doleful picture of appellant's poverty might tend to show that he could not raise the fee required to be paid to the Government ; but this was paid and afterwards withdrawn.

As a test, suppose that from extreme poverty appellant had not made application in 1850 ; can it be pretended that on his application made in October, 1858, he would be entitled to a patent on the evidence in this case?    Surely not ; and yet, how can the fact of having made an application in 1850, which was voluntarily withdrawn, better his condition?    It is said on the other side, the Commissioner has decided that he was then entitled to a patent ; very well ; and so he was equally entitled to a patent without making application.    In one case he could not get the patent without perfecting his application and prosecuting it, and in the other case he could not get it without applying for it.    In either case the non-grant of a patent was by reason of laches.    The poverty of Lazarus would not avail to retain the right in view of such laches, and for the very sound reason that the law presumes

that a party who makes an invention will be able to raise money enough to apply for and prosecute his application for a patent; and the statute has not provided a charity fund for the relief of indigent genius, nor has it made special provision for the perpetuation of the rights of that class of inventors.

[The remainder of the argument upon this head is omitted.]

The fourth reason of appeal (for the fifth is no reason at all) is that the Commissioner erred in deciding that Wickersham's invention had been in public use or on sale, with his consent and allowance, more than two years before the date of the renewal of his application for a patent upon which the interference was declared. Assuming all other points to be decided in favor of Wickersham, in this he must, I submit, fail. The present application was filed October 6th, 1858. The proof is clear and undisputed that in the spring of 1856, nearly two years and a half before, he was engaged in hunting up and trying to remember facts for the defense in suits brought by Singer under his patents and against machines having the kind of feed now in controversy. Here, then, is undisputed evidence that more than two years before his pending application he had knowledge of the public use and sale of the invention claimed by him, and there is no evidence tending to show that he protested against such use and sale. Under the seventh section of the act of 1836 the Commissioner has jurisdiction, and must reject.

As by the provisions of the seventh section of the act of 1839 the inventor must not permit the public use or sale more than two years before his application, the ruling in the cases of Shaw v. Cooper and Pennock v. Dialogue, before cited, apply with peculiar force; for after he became aware, by his connection with the Singer suits, that Singer had patents, and that machines of this kind were not only manufactured and sold extensively, but that they were already the subjects of litigation, he was bound, on pain of forfeiture of his right, to make immediate assertion of his claim. This he not only failed to do, but so completely had he abandoned the invention that Singer's patents and the defendant's machines failed to recall to his mind that he had ever invented such improvements or that he had ever named them in any application for a patent.

In conclusion, for I fear that I have already overstepped the

bounds of moderation in the length of my argument, I beg to refer to the opinion of Mr. Justice Nelson in the case of Parkhurst v. Kinsman, 1 Blatchford, 488, 494, in which it was held that delay in making application for a patent, or in putting the invention into actual practical use until after another has reduced the invention to successful practice and obtained a patent, works an abandonment of the right.    In that case the delay was much less than in this, and the evidence proved poverty as an extenuating circumstance to account for the delay.

, The policy of the law of patents, which is to encourage the rapid and practical progress of inventions, calls for a construction of its several provisions, such as shall protect those who couple with ingenuity industry and activity of purpose in the production of inventions and the introduction of them into public and successful use.

Public policy, which looks not simply to the reward of ingenuity, but the good of the many, calls for such an administration of the law as shall, while avoiding injustice to any, and with a due regard to a just reward to the true inventor, put into the possession of the public all valuable inventions within the shortest practical period—such an administration of the law as shall discourage delay in perfecting and reducing useful inventions to practical and public use.

MERRICK, J.

The claim in this case is for two improvements upon sewing machines, the first being for the application of a feed mechanism, consisting of a roughened wheel combined with a spring pressure plate, which enables an operator to sew seams of any shape or curvature with equal facility as straight seams could have been previously made ; and the second claim is for placing the feeding wheel in such position that its operative part shall project through the surface of the table of the machine so as to act upon the fabric served in a convenient way for advancing the material to the needle and for disengaging the portion already stitched.    The interference is most clearly stated, as is the whole history of the case, in the well-considered report of the revisory board of the Office, which forms the basis of the Commissioner's decision.    The Commissioner, upon that report, decided that Wickersham was

the prior inventor of these improvements, but rejected his claim for a patent because of abandonment, laches, and two years' public use by his allowance.

The reasons of appeal present three points of alleged error in that decision : First. That the Commissioner has no jurisdiction to inquire into and determine upon the matter of abandonment. Second. That there was never an abandonment of the claim by Wickersham. Third. That the period of two years' public use, with the knowledge and allowance of the applicant, is not to be computed from the date of his present application, but that this is purged by the original application, made in February, 1850, and withdrawn in 1851 on account of mistaken or erroneous suggestions from the then Commissioner. The jurisdiction of the Commissioner over the question of abandonment has been repeatedly asserted by successive Commissioners with great force of reasoning, and on two occasions has been unequivocally upheld on appeal by Judge Morsell ; first in the case of Mowry v. Barber (ante, p. 563), and again in the case of Ellithorp v. Robertson (ante, p. 585). Upon careful consideration of the arguments in this case, I find no ground on which the correctness of those rulings can be impeached. It is said that no power or jurisdiction can be exercised by the Commissioner which has not been granted him by the statutes ; that this power has not been expressly granted, and that the policy of the law is to withhold this investigation from him, and to reserve it for settlement· by a jury after a patent shall have been granted.

No one will deny that the Commissioner must look to the statutes creating his office and defining his duties for every power which he can exercise ; but it by no means follows that every power and jurisdiction must, upon the face of the statute, appear in words of express reference and definition. All the laws made upon the same subject are to be construed together, and the meaning of the legislature to be gathered from every part and from the general policy designed to be carried out by the several enactments. A liberal interpretation for the purpose of making the parts of a system consistent and harmonious with one another is admitted to be a proper rule of construction ; and in regard to the patent laws themselves, the greatest of American judges has declared that they "ought to be construed in the spirit in which they have been made."

Now, the counsel of the applicant admits in his argument that although the Commissioner of Patents is not mentioned in the seventh section of the act of 1839, nor, so far as the section itself discloses, alluded to in the clause saving to the applicant the effects of any use in public short of two years in duration, yet he must by necessary intendment have the duties prescribed to him by the sixth section of the act of 1836 modified by that section so far as to make it his duty to grant a patent under that sixth section, notwithstanding a public use or sale of the invention, unless that public use or sale has continued for more than two years prior to his application.　The disability springing out of abandonment is not only found in this seventh section, but is found in the same clause, and is made an alternative to the vice of two years' public use.　If, then, the Commissioner is enjoined, although nowhere named in that section, not to reject a patent except on proof that the invention has been in public use or on sale for more than two years, how can the other alternative be discarded from the sentence, to wit, " on proof of abandonment of such invention to the public?"　This will be the more apparent if we invert the order of succession of the two parts, and read the latter part of the section with no other change than this insertion, as follows: "No patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application aforesaid, except on proof that such purchase, sale, or prior use has been for more than two years prior to such application for a patent or of abandonment of such invention to the public."　Now, considered with reference to the section taken by itself, this inversion of the two parts of the sentence does violence neither to its apparent meaning nor to its grammatical construction; and it makes manifest that if to carry out the design of the legislature it be necessary for the true reading of the last branch of the sentence that the words "by the Commissioner" be interpolated after the words "no patent shall be held to be invalid," the same interpolation should be extended and applied to the other branch declaring the effect of an abandonment.　Indeed, but one reason for so forced a separation of these two matters of inquiry is assigned, which is, that the party ought to have an opportunity afforded him by the emanation of a patent to test this question before a jury, who alone are fitted to try questions involving fraud or

intent; and that otherwise, upon error committed by the Commissioner, the party would be without remedy; but a reference to the sixteenth section of the act of 1836, and the tenth section of the act of 1839, furnish an answer to this objection. It is there provided that a disappointed applicant may file his bill in equity for redress; and according to the course of the court of chancery, if the judge thinks the case proper for a jury he may order an issue to be tried before a jury to enlighten his conscience upon the matters of fact in controversy. But were this remedy not open to the party it would be strange indeed to construe the law as requiring the Commissioner to issue a patent upon a state of case which, when next day made apparent to a court of law or equity, would require that court to pronounce the patent utterly void. It is said that the law never requires vain things to be done; but to require a Commissioner of Patents to issue a worthless and void patent would be worse than vain. It would be to direct that persons should be armed with a warrant under the great seal of the United States, in order to go into all the courts of justice in the land to hunt down their fellow-citizens with oppressive, idle, and vexatious litigation. A body of laws designed "to promote the progress of science and the useful arts" could never "be construed in the spirit in which they have been made" if the statutes were interpreted so as to produce results like these. I think, therefore, that the first reason of appeal cannot prevail, and that the jurisdiction of the Commissioner over the question of abandonment is clear under the seventh section of the act of 1839, and that it is unnecessary to resort in aid of the jurisdiction to the eighth section of the act of 1836, from which indeed strong arguments might be drawn to show that he possessed the power upon an issue of interference if he had it not upon all forms of application for patents.

The controlling principles of law by which the claims of the applicant, under the second and third grounds of alleged error, are to be weighed in connection with the facts disclosed upon the record, may best be stated in the language of the Supreme Court, as follows: "It is the unquestionable right of every inventor to confer gratuitously the benefits of his ingenuity upon the public; and this he may do either by express declaration, or by conduct equally significant with language, such, for instance, as acquies-

cence with public knowledge in the use of his invention by others ; or he may forfeit his rights as an inventor by a willful or negligent postponement of his claims, or by an attempt to withhold the benefit of his improvement from the public until a similar or the same improvement should have been made and introduced by others.    Whilst the remuneration of genius and useful ingenuity is a duty incumbent upon the public, the rights and welfare of the community must be fairly dealt with and effectually guarded. Considerations of individual emolument can never be permitted to operate to the injury of these." Kendall v. Winsor, 21 Howard, 329.)    And again, in the often-quoted case of Shaw v. Cooper, (7 Peters, 321,) the court say : " The acquiescence of an inventor in the public use of his invention can in no case be presumed where he has no knowledge of such use ; but this knowledge may be presumed from the circumstances of the case."

The prominent facts of the case are that Wickersham made an application for a patent for sundry improvements upon sewing machines, embracing the two claims now in question, on the 13th of February, 1850.    On the 20th, his specifications and drawings were returned to him for the purpose of having them put in proper shape for adjudication.    On the 15th of March he transmitted new drawings and specifications, returning at the same time the originals, as instructed.    These new specifications and drawings, not purporting to be additional to, but substitutes for, the original, nowhere contained any allusion to the claims now in question.    They, too, were returned, because not conforming to the regulations of the Office and the express requirements of the statute; and in reference to the claims in this second set of drawings and specifications, the Office letter of April 5th, 1850, inclosing them for further amendment in compliance with the terms of the law, suggested that, so far as appeared, only the first of the improvements therein claimed was patentable.    Without further attempt to amend his application or to procure any determinate action of the Office, the case remained in this predicament until on the 28th of May, 1851, he wrote to the Office, withdrawing his application and requesting return of $20 under the law.    The amount of $20 was accordingly returned to him on the 12th of June, 1851, after an intermediate letter of the 6th of June reiterating his application for withdrawal and directing the mode of

transmitting the $20. From that time to the 2d of October, 1858—the date of his oath to present application—he made no movement towards a renewal of his pretensions before the Office, nor, for aught that appears in the testimony, did he make any effort to get others to assist him in prosecuting or renewing the claim, although he made efforts to procure patents for other matters. Meantime, I. M. Singer, the contestant, who appears upon the face of the record to have been likewise a *bona-fide*, original inventor of these same improvements, (and, to say the least of them, in a more complete and better form, if not thereby independently patentable, by the substitution of the roughened or corrugated feed wheel for one armed with numerous sharp-pointed projections,) made applications, dated, respectively, on the 18th of October, 1850, and on the 15th of March, 1851, which, being diligently and persistently urged before the Office, resulted in patents of August 12th, 1851, (No. 8294,) amended and reissued October 3d, 1855, (No. 278,) covering the first and most important of the two claims, and in a patent of November 4th, 1856, (No. 16,030,) covering the second improvement. Singer's machine was first used in Boston, the place where Wickersham lived in the fall of 1850, (Potter's deposition, eighth interrogatory, and Roper's deposition, eleventh, twelfth, and thirteenth interrogatories,) containing both these improvements. In 1853 Singer's machines were commonly and notoriously in use and on sale in Boston. (See Bradshaw's deposition to re-cross interrogatories 4 and 5.) Did Wickersham know of their use at that time, he being at the same time in the same market a manufacturer and vender of rival sewing machines, as appears by the testimony? (See depositions of Arnold and Butterfield.) And is it fair to presume this knowledge "from the circumstances of the case," to use the language in Shaw *v.* Cooper? But there is another item of proof to be found upon the records of the Patent Office and among the files sent to me which seems to have escaped the observation of the counsel on both sides, which proves beyond controversy that Wickersham was all this while keenly alive to his interests, conversant with the state and progress of the art, watchful of all competitors, and aware, to say the least, that Singer was a manufacturer of sewing machines. I refer to his letter of protest to the Office, dated March 14th, 1853, in which he objects to Singer's

being allowed a patent for an improvement in the use of a straight needle in sewing machines. After all this, it is true that Wickersham went to England in January, 1854, and remained abroad until the close of the year 1855 or beginning of 1856. Whatever knowledge he may have derived of Singer's use of his improvements, is not to be excepted out of his memory nor to be abated from the legal operation of delay in asserting his rights on account of his absence beyond seas for these two years. But suppose it were even so that up to the time of his return from Europe he had no knowledge of the public sale of his improvements, how stands the case afterwards? According to the testimony of Webster (answer to twenty-sixth interrogatory, page 21) and the testimony of Potter (answer to fourth interrogatory, page 55, and to eleventh and twelfth cross-interrogatories, page 57) the inventions of Singer were carefully explained to him by Potter, a party interested in procuring testimony to defend these identical claims, and Wickersham, on the trial in New York in May or June, 1856, was examined as a witness against Singer upon these claims. The witness Potter does indeed say that in any conversation he may have had with Wickersham subsequent to May or June, 1856, he may not have adverted to the points involved in these claims, because they had subsided in importance in regard to the after-stages of the controversy. But he nowhere says in his cross-examination, as intimated by counsel to have been the purport of his answers to the eleventh and twelfth cross-interrogatories, that he had not distinctly explained and unfolded the whole matter to Wickersham in his interviews in the spring; and there is no qualification of Webster's statement that the whole matter was fully disclosed in April, 1856. If, then, Wickersham was all the while alive to the importance and value of his invention, and designed, so soon as pecuniarily able, to renew his application for a patent, it passes human credulity to believe that he did not know in the spring of 1856 of the public use and sale of the improvements in question. If still too poor to renew his application, a cheap and obvious way of asserting his exclusive claims was open to him, viz., by warning Singer that he himself was the original inventor, and notifying him that he still insisted upon his claims and meant to vindicate them at the proper time and in the proper way. But nothing of this sort

appears in the testimony, nor is there any word to warn Singer of any exclusive claim of another; but, on the contrary, so far as Singer is concerned, the conduct of those suits and Wickersham's participation in them as a witness were the broadest proclamation that these improvements were free and common property to the whole world, and that no human being was to be restricted from their free and unbought use.

Now, from May or June, 1856, down to October, 1858, two years and four months at the lowest calculation, Wickersham interposes no objection to the public sale and use by Singer of his invention. But it is argued that the power of attorney executed by Wickersham in favor of Henry B. Renwick, dated April 11th, 1856, discloses an assertion of right and a purpose to prosecute his claim to a patent. Potter's deposition to fourteenth cross-interrogatory explains the reason why that instrument was drawn in the form it bears; that the sole object of executing it was to procure Wickersham's drawings and specifications from the Patent Office, to be used in evidence in the suits of Singer against Grover & Baker and Wheeler & Wilson in New York; and that it was his habit to adopt that form of power for similar purposes. Furthermore, that he never promised Wickersham to renew his application, nor was he ever requested to do so. And Renwick, in answer to the ninth interrogatory, page 60, says that he neither took any steps to procure Wickersham a patent, nor was he ever requested to do so. Potter states, also, in answer to the fourth interrogatory, that when Wickersham signed that power of attorney he expressly said that he wished it understood that they (Grover & Baker and Wheeler & Wilson, or their agents) should pay Renwick, and that he should be put to no expense about it. The learned counsel for the applicant has argued that "if the well-settled rules of law prevail," the purport of this instrument cannot be changed by parol; "and that this document is conclusive to show that within two years after Singer had obtained his first patent Wickersham had not consented or allowed the public use of his invention, but was asserting his right and contemplating its prosecution." There is no such rule of law in regard to written instruments where they are invoked to effect the rights of third persons—strangers to the instrument—and not in privity of estate or interest with the parties thereto

but, on the contrary, parol proof is always open "to third persons who, if it were otherwise, might be prejudiced by things recited in the writings contrary to the truth, through the ignorance, carelessness, or fraud of the parties, and who therefore ought not to be precluded from proving the truth, however contradictory to the written instruments of others." (Supreme Court of the United States in case of Burreda *et al. v.* Silsbee *et al.*, 21 Howard, 169.)

From the prominent facts of the case which have been adverted to, it will appear that prior to 1854 the facts and circumstances within reach of Wickersham furnish the strongest presumption of his knowledge of the use in public of this invention as embodied in the Singer machines; and that in the spring of 1856 knowledge in fact of Singer's assertion of right was communicated to him, and that he so acquiesced in that public use as to prevent him from ever after asserting his exclusive right to the invention, unless his continued supineness is to be purged, in contemplation of law, by the circumstances connected with his first application, so as to carry back and connect by legal relation his present application to the date of his first application in February, 1850. The decisions of Judge Woodbury in the case of Adams *v.* Edwards, 1 Fish., 1; of Judge Nelson in Gaylor *v.* Wilder, 1 Blatch., 597; and of Judge Grier in Rich *v.* Lippincott, 2 Fish., 1, are relied upon as settling by the highest authority that if a first application is withdrawn, either for the sake of the money on account of poverty, or under a mistake—if it was rejected by the Office under a mistake and the inventor yielded, but on discovering his mistake, or being better advised, made a new application within a reasonable time—there is in such case no abandonment of his invention, and the second application will relate back to the first. To understand the rulings of these eminent judges it is necessary to advert to the state of facts to which in the instances given their decisions were applied. They were all three given in suits upon the same patent and upon the same state of facts, which were substantially as follows: Daniel Fitzgerald filed an application for a patent for an improved fireproof safe on the 1st of April, 1836, which was rejected in September following; and on the 22d of December he applied for a patent for the combination of a desk and safe, which was granted in August, 1837. Fitzgerald was in partnership with one Sherwood,

who applied for a patent for a rotating safe, which was issued in May, 1837. On the 27th of June, 1837, after Sherwood's patent, and pending his application for the desk and safe combined, Fitzgerald wrote to withdraw his first application of April, 1836, and it was withdrawn in September, after his patent for the combined safe and desk was issued. Both Fitzgerald and Sherwood continued to make safes, not using the mechanical contrivances they had patented. In January, 1838, Fitzgerald applied for a patent for a safe substantially the same as his first application, which was rejected and subsequently withdrawn. In March, 1838, Fitzgerald assigned his patent of 1837 to Wilder, and agreed to make all necessary application for improvements and additions. In 1839, April 11th, Wilder, as assignee of Fitzgerald, again applied for a patent for a salamander safe, varying somewhat the description, upon which, after various rejections and modifications of specification, a patent was granted in June, 1853. It appeared also that prior and subsequent to the issue of the patent of August, 1837, Fitzgerald and Wilder had made and sold salamander safes, describing them as patented; and there was also evidence to show that Fitzgerald claimed and represented to Wilder that his patent of August, 1837, embraced the salamander safe ; that when Wilder discovered that the patent did not, as he had supposed, cover the salamander safe, but only the combination of desk and safe, he made efforts to obtain one that would. Upon that state of facts it was held by the several judges above named that if Fitzgerald or his assignee supposed their patent of 1837 covered the invention of a salamander safe, when in fact it did not, and that under that supposition they made and sold safes for more than two years prior to their application of 1839, and that the application of 1839 was filed upon the discovery that their safes were not protected by that patent, and that this application was made with diligence after such discovery,—then the application of 1839 related back to application of 1836, which was erroneously rejected in 1836. The jury found these facts to exist, and thereupon the patent of 1853 was sustained. The precise language which Judge Nelson used in his instruction upon the case may be found at page 585 of 10th Howard's Supreme Court Reports, in case of Gaylor v. Wilder, and will here be quoted to prevent the Office from misapprehending, by reason of the argu-

ments filed in this case, the form of his ruling: "If they [the jury] found that Daniel Fitzgerald was the first and original inventor of said improvement, as set forth in said patent, and had not abandoned or dedicated the same to the public, but had with reasonable diligence pursued his invention till he had perfected the same, and used due diligence in applying for and pursuing his application for a patent until he obtained the same, then he was entitled to recover." Upon that charge and that evidence the finding was for the plaintiff. In other words, the jury ascertained by their verdict that the first application of 1836 was withdrawn by Fitzgerald, upon the idea that the application and patent issued a few months later covered the invention; that he continued uniformly and unremittingly to assert exclusive right over the invention, selling it as patented; that so soon as he discovered that he was mistaken, and that the patent under which he was operating did not cover the invention, the assignee renewed his application and had the mistake corrected—certainly within twelve months, for his assignment bore date March 28th, 1838, and the renewed application was filed April 11th, 1839, and, as appears from other parts of the testimony, this discovery must have been subsequent to August, 1838—the time of a certain contract between Wilder and William Adams and others, which gave rise to the suit before Judge Woodbury.

It appears, then, from these decisions that the withdrawal of an application and the return of twenty dollars—part of the patent fee—is not of itself an abandonment or dedication of one's invention to the public, but is an equivocal act, to be interpreted by surrounding circumstances, and to be affected upon a second application by the subsequent conduct of the party—his diligence or his neglect and delay—in the same manner as his conduct is to be weighed in regard to an original application; and so I understand the practice of the Office to have been to receive renewed applications, either for the whole or a part of a rejected claim, where good cause and due diligence are shown. The claims of Singer himself in this case show that they were embraced in his first application, omitted from his patents, and afterwards awarded to him—the one in his renewed patent of 1854 and the other upon the crowning of his persistent applications and continued claim down to 1856. With regard to the first, it per-

haps more properly falls within the class of reissues under the thirteenth section of the act of 1836 and the eighth section of the act of 1837 ; but not so with the patent of 1856, which is not a reissue.

How stands the case of Wickersham in this regard? I think it has very properly been argued that there never was any rejection by the Office of his claims to the present invention.    The law requires explicitly that the applicant shall file a clear and intelligible representation of his invention and claims of novelty in both specifications and drawings, to be signed by him and attested by two witnesses ; and when papers are filed without these due formalities, it is the duty of the Office to decline to act upon them in their imperfect state, and to return them · to the party, with such suggestions as may present themselves for the better information of the party.    Certain suggestions were made to Wickersham and communicated by note of February 20th, 1850.    A new set of specifications and drawings, by their appearance manifestly substitutional, and not merely additional or amendatory of the first, were shortly forwarded, and these were again returned, for the purpose of being authenticated according to law by Office letter of April 5th, 1850.    Neither in these specifications. or drawings nor in any of the models did the claims now in question appear ; and of course · in reference to this second set must that Office letter be understood ; nor, indeed, even so understood, can it be regarded as a final judgment upon his case.    He seems to have made no further effort to comply with the law until he withdrew the case.    It certainly is not the duty of the Office to stand at the elbow of applicants to unfold to them the importance of their inventions and to explain to them everything which they might do to procure a patent.    Persons are presumed to possess a reasonable amount of intelligence and acquaintance with the modes of doing business.    It would be impossible for the Patent Office to conduct its varied and multiplied business if its officers were charged with the duty of preparing each man's case for him and watching carefully that he fall into no mistake of fact or law; and should the Office itself make a mistake in its judgment upon a case which does not create a delusion in the mind of the party as to his rights, can he repose. upon that mistake, and make it operate as an indefinite excuse to him for delay-

ing the further prosecution of those rights, either by endeavoring to convince the Office by claim for rehearing of a palpable error or by resorting to the easy and expeditious means for revising their decision upon appeal, as the statutes provide? Now, that Wickersham was led into no mistake or delusion as to his rights by any supposed decision of the Office, is manifest from the testimony of his own witness upon questions put by his attorney. At page 20, deposition of Justus Webster, answer to sixteenth interrogatory, "he [Wickersham] has told me since that he made an application himself, and that it was rejected; he felt very much disappointed, and he thought he was rejected because he made the application himself instead of employing an attorney." Here, by his own admission, he was led into no mistaken opinion of his rights by the action of the Office, but distinctly avowed afterwards his full knowledge and confidence ,in them. The ex-, cuse of mistake, then, is taken away from his unbroken repose of more than seven years. But his poverty is assigned as a reason for not applying earlier. The measure of poverty which one must possess before he is required to exercise any diligence to prosecute his rights is not to be found in the statute. It is an excuse very readily made, which yet should not too readily be listened to. If a man be utterly destitute of money and without friends, and incapable thereby of prosecuting an enterprise, much indulgence may be shown him; but where he has the means of carrying on sundry enterprises of a kindred sort, equally demanding money and friends, and does carry them on, his election to pursue those other enterprises will not be regarded in the law as an excuse for delay in the one where valuable rights of others equally meritorious with himself, and, in the outset of their successful struggles, equally poor, are to be prejudiced. An election thus made for his supposed advantage or gratification at the time, according to the plainest principles of equity, must not be invoked for the subsequent detriment of another innocent party. It appears that Wickersham applied for five several patents in this country and for one in England during this period, and that he was not without credit and means to go to England in 1854 in pursuit of' success. These repeated applications to the Patent Office furnish, also, another presumption as to the suggestion made of his ignorance of business, to wit, that he must have be-

44

come by this frequent intercourse with the Office sufficiently conversant with the patent laws and the mode of doing business to vindicate his rights, if they had been deemed by him of sufficient importance. The foregoing comparison of the facts of this case with the facts in the case of Fitzgerald, show that although the doctrine of the relation of a patent to the initiatory proceedings (a doctrine also familiarly applied in matters of land grant to connect an original claim and survey with a junior patent of land in favor of a diligent party, so as to cut out a senior patent procured upon a junior survey and claim) may be resorted to for the purpose of upholding a patent for a valuable discovery, yet the doctrine will not be applied to a case which does not present the element of "due diligence in applying for and pursuing his application for a patent until he obtains the same."

Upon the points, then, of abandonment and want of diligence and of refusal to connect the present application with that of February, 1850, by relation, and also of the public use of the invention for more than two years with the knowledge and consent of Wickersham, I am of opinion that the judgment of the Office was correct.

Now, therefore, I, William M. Merrick, an assistant judge of the Circuit Court of the District of Columbia, do certify to the Hon. William D. Bishop, Commissioner of Patents, that having duly assigned a time and place for hearing the above-entitled cause, and having considered the reasons of appeal filed by the appellant and the grounds of the decision of the Commissioner in the case, and having attentively examined the testimony and read the arguments filed by counsel for both parties, I do adjudge and determine that the decision of the Commissioner upon the points involved in said reasons of appeal be, and the same is hereby, affirmed, and that the application of William Wickersham in the premises be finally rejected.

*B. R. Curtis*, for the appellant.

*Chas. M. Kellar*, for the appellee.